IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

GLENDA RENEA HENSLEY,          )
                               )
Plaintiff,                     )
                               )
vs.                            )  NO. 2:14-CV-0208
                               )
CAROLYN W. COLVIN,             )
ACTING COMMISSIONER OF         )
SOCIAL SECURITY,               )
                               )
Defendant.                     )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff Glenda Renea Hensley. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**


BACKGROUND

On March 29, 2011, Glenda Renea Hensley ("Hensley") filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401, *et seq*., and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. section 1381, *et. seq*. Hensley alleges that her disability began on January 29, 2010. The Social Security Administration ("SSA") denied her

initial applications and also denied her claims upon reconsideration.

Hensley requested a hearing, and on January 15, 2013, Hensley appeared with a non-attorney representative, Bryan Woodruff, at an administration hearing before Administrative Law Judge ("ALJ") David R. Bruce. Testimony was provided by Hensley and vocational expert Thomas A. Grzesik. On February 20, 2013, the ALJ issued a decision denying Hensley's claims, finding her not disabled because she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 28.)

Hensley requested that the Appeals Council review the ALJ's decision, but that request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Hensley initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION[1]

Facts

Hensley was born in 1974, and was 35 years old at the onset of her alleged disability. (Tr. 43.) She has a high school

---

[1] These facts have been borrowed liberally from parties' briefs.

education.  (Tr. 44.)  Hensley's past relevant work was as a film developer operator and a deli cutter/slicer.  (Tr. 65.)

In 2010, Hensley met with doctors regarding her back pain. In April 2010, Shanu Kondamuri, M.D., diagnosed lumbar degenerative disc disease, lumbar radiculitis and annular tears at L4-L5 and L5-S1, and recommended physical therapy, epidural steroid injections, and medications.  (Tr. 280.)  Dr. Kondamuri opined that Hensley's "disease is not that severe and I would not support the use of Norco or other short acting potentially addictive opioid medications on a long term basis."  (*Id.*)

On May 13, 2010, Hensley was hospitalized after the police found her inhaling aerosol.  (Tr. 295.)  Hensley claimed she was "getting high but was not trying to kill herself."  (*Id.*)  She exhibited poor insight and judgment, reported some anxiety, and was depressed, but not suicidal.  (*Id.*)  Hensley was diagnosed with major depression and substance abuse.  (*Id.*)  She was prescribed Cymbalta and directed to follow-up with an outpatient substance abuse program.  (Tr. 296.)

On May 22, 2010, Hensley was hospitalized after the police found her unresponsive with two empty cans of aerosol.  (Tr. 290.) She indicated that she was trying to commit suicide due to numerous stressors in her life.  (*Id.*)  Hensley was informed that because of her multiple hospitalizations secondary to her depression and substance abuse, they would "try to court commit her to treatment."

3

(*Id.*)  Treatment notes indicate that she was not compliant on an outpatient basis, in that she did not follow up or take her medication.  (*Id.*)  They found an inpatient treatment program for her, and on June 2, 2010, Hensley "stated she was doing much better, not depressed, not suicidal, not homicidal.  No anxiety."  (*Id.*)  She was diagnosed with major depression and bipolar disorder, and was prescribed Cymbalta, Risperdal, and Soma.  (Tr. 291.)

On July 16, 2010, Hensley was hospitalized on an emergency detention order secondary to major depression with suicidal ideation.  (Tr. 284.)  At the time of admission, she appeared very depressed and claimed to be hearing voices.  She had symptoms of racing thoughts, decreased sleep, tearfulness, and anxiety.  (*Id.*)  Treatment notes state that "[o]n past admission [Hensley] stated that she was just getting high and to avoid going to jail she stated she was suicidal," but admitted to being suicidal on this occasion.  (*Id.*)  A court ordered outpatient compliance with medications and outpatient follow-up.  (*Id.*)  Hensley was informed that if she did not comply with treatment "she will most likely be taken back to court for state commitment to the hospital."  (Tr. 285.)  On August 10, 2010, Hensley indicated that she was feeling well, had no depression, suicidal thoughts, hallucinations, or delusions.  (*Id.*)  She was diagnosed with bipolar disorder with psychotic features and polysubstance abuse.  (*Id.*)

On August 17, 2010, Hensley was hospitalized for a possible medication overdose after her boyfriend had a difficult time waking her. (Tr. 870.) She denied taking too many medications or intentionally overdosing. (*Id.*) She was diagnosed with overdose of narcotics and benzodiazepines, fatigue, drug dependency, bipolar disorder, lumbar disc displacement, and chronic pain. (*Id.*) She was prescribed medications and discharged after two days. (Tr. 871.)

On September 16, 2010, Mathew Castelino, M.D., performed a mental status examination ("MSE") of Hensley, which revealed problems with her mood, sleep, anxiety, and anger. (Tr. 380.) Dr. Castelino prescribed Risperdal, Depakote, and Cymbalta, and subsequently, Seoquel. (*Id.*, Tr. 384.)

On November 11, 2010, Darryl L. Fortson, M.D., replaced Hensley's previous primary care physician. (Tr. 312.) Hensley reported a diagnosis of juvenile rheumatoid arthritis and complained of back pain and right hip and knee pain. (*Id.*) Hensley had tenderness in the low back, painful range of motion in the knees, and positive straight leg raising. (*Id.*) Dr. Fortson diagnosed rheumatoid arthritis and low back pain, and prescribed Percocet, and Valium, among other medications. (*Id.*)

On January 5, 2011, Hensley met with Manjari Malkani, M.D. (Tr. 317.) Hensley reported multiple joint pains, including knee and back pain. (*Id.*) Dr. Malkani reviewed an MRI from 2009, which

revealed mild disc degeneration at L3-4, L4-5, and L5-S1, associated mild broad-based disc protrusions and posterior marginal fissuring of L4-5 and L5-S1 disc space. (Tr. 318.) Dr. Malkani diagnosed chronic low back pain, chronic bilateral knee pain, and weight gain, and requested blood tests. (*Id.*) On January 19, 2011, Hensley met with Dr. Malkani again, and was diagnosed with fibromyalgia, vitamin D deficiency, low back pain, and depression. (Tr. 315.) Dr. Malkani recommended treatment with Cymbalta and follow-up with a pain clinic. (*Id.*)

On January 20, 2011, Hensley told Dr. Fortson that she was feeling worse, and was having severe muscle spasms even after taking medications. (Tr. 445.) Dr. Fortson prescribed Percocet, Soma, and Xanax. (*Id.*) On February 18, 2011, Hensley complained to Dr. Fortson about back pain, despite starting physical therapy. (Tr. 444.) On April 6, 2011, Hensley told Dr. Fortson that her pain was such that she could "hardly walk" despite taking medication. (Tr. 442.) Dr. Fortson diagnosed acute lumbar disc herniation. (*Id.*)

On April 7, 2011, an MRI of her lumbar spine revealed normal alignment of the lumbar spine, no compression fracture, an L3-4 broad-based disc bulge, broad-based disc bulges with annular disc tears at L4-5 and L5-S1, multilevel spondylosis, with no central canal stenosis and no neural foraminal compromise. (Tr. 360.)

On April 13, 2011, Dr. Castelino completed a Psychiatric/Psychological Impairment Questionnaire regarding Hensley.[2] (Tr. 244-51.) Hensley was diagnosed with schizoaffective disorder. (Tr. 244.) The clinical findings supporting this diagnosis included poor memory, social withdrawal, emotional lability, inappropriate affect, delusions or hallucinations, decreased energy, manic syndrome, recurrent panic attacks, psychomotor retardation, paranoia or inappropriate suspiciousness, generalized persistent anxiety, difficulty thinking or concentrating, suicidal ideation or attempts, and disturbances with perception, sleep, and mood. (Tr. 245.) Hensley's primary symptoms were found to be mood swings ranging from depression to mania, very low energy, and low self-esteem. (Tr. 246.) Hensley was found to be "markedly limited" in her abilities to: remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine

---

[2] The ALJ's decision addresses this questionnaire, identifying it as "the assessment of Dr. Castnuo." (Tr. 25.) While the questionnaire was directed to "John Castnuo, M.D.," the signature of the doctor who completed the questionnaire is unclear. (Tr. 244, 251.) Both parties represent that the questionnaire was in fact completed by Dr. Castelino. (DE## 11 at 21 & n.55, 16 at 9 & n.2.)

without supervision; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel to unfamiliar places or take public transportation; and set realistic goals or make plans independently. (Tr. 246-249.) Hensley was "moderately limited" in her abilities to understand and remember one or two-step instructions; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions. (*Id.*) Dr. Castelino opined that Hensley was incapable of handling "even low stress" work. (Tr. 250.)

On April 15, 2011, Hensley asked Dr. Fortson to increase her pain medication because she could not get out of bed without taking medication and waiting for it to "kick in." (Tr. 441.) Dr. Fortson diagnosed lumbar disc disease and prescribed Percocet, among other medications. (*Id.*)

In April and May 2011, Hensley met with Randolph Chang, M.D., complaining of chronic low back pain. (Tr. 473-74.) Dr. Chang recommended, and Hensley received, two epidural steroid injections during that time. (Tr. 469-72.) In June 2011, Dr. Chang performed a right hip bursa injection (Tr. 476), and a right lumbar paraspinous muscle multiple trigger point injection on Hensley. (Tr. 519.)

On June 3, 2011, Teofilo Bautista, M.D., performed a physical evaluation of Hensley at the request of the SSA. (Tr. 423.) Hensley claimed to have auditory and visual hallucinations. (*Id.*) She refused to do range of motion testing of the back due to low back pain. (Tr. 425.) An examination revealed pain, tenderness, and muscle spasms in the lumbosacral area, and pain and tenderness in the right hip area and right knee. (*Id.*) The weakness in the right lower extremity measured at 4/5. (*Id.*) Dr. Bautista diagnosed chronic low back pain with degenerative disc disease at L3-4, L4-5, and L5-S1, with mild disc protrusion and right hip pain, right knee pain, mild scoliosis, and a history of fibromyalgia. (*Id.*)

On June 8, 2011, Raymond Bucur, Ph.D., performed a psychological evaluation of Hensley at the request of the SSA. (Tr. 430-36.) Dr. Bucur diagnosed schizoaffective disorder, panic disorder with agoraphobia, mood disorder, and ruled out polysubstance disorder (presumably based on Hensley's denial of substance abuse). (Tr. 431-32, 436.) Dr. Bucur indicated that Hensley did not appear to be able to manage her own funds, and gave her a GAF score of 40. (*Id.*)

On June 9 and 14, 2011, Hensley met with Dr. Castelino, and an MSE revealed anxiety and disturbed mood and sleep. (Tr. 610, 614.) Hensley was prescribed Seroquel, Cymbalta, Ambien, and Latuda. (Tr. 610.)

On June 26 and July 6, 2011, state agency medical consultant J. Sands, M.D., reviewed Hensley's file and completed a Physical Residual Functional Capacity Assessment. (Tr. 538-46.) Dr. Sands opined that Hensley could lift twenty pounds occasionally and ten pounds frequently, sit, stand and walk for about six hours in an eight-hour workday, and had some postural limitations. (Tr. 539-40.) Dr. Sands noted Hensley's slight limping gait due to right hip and knee pain, and a limitation in her knees. (Tr. 539.) He opined that Hensley's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and their impact on functioning were not consistent with the totality of the evidence. (Tr. 543.) State agency medical consultant J. Eskonen, D.O., reviewed the file and affirmed Dr. Sands' opinion without comment on September 16, 2011. (Tr. 566.)

On July 12, 2011, state agency medical consultant Donna Onversaw, Ph.D., completed a Mental Residual Functional Capacity Assessment of Hensley. (Tr. 547-64.) Dr. Onversaw found that Hensley was either "not significantly limited" or "moderately limited" in understanding, memory, sustained concentration and persistence, social interaction, and adaption. (Tr. 547-48.) She opined that while Hensley may have difficulty with more complex tasks, she retains the ability to perform and complete tasks without special considerations or accommodations. (Tr. 550.) Dr.

Onversaw remarked that progress notes did not reveal ongoing hallucinations or delusions as claimed by Hensley, and that the severity suggested in Dr. Castelino's April 2011 opinion "is not consistent with the numerous progress notes from mid '10 up to current." (Tr. 549-550.) Dr. Onversaw opined that Hensley's functional limitations were only mild or moderate. (Tr. 561.) State agency reviewing consultant Joelle Larsen, Ph.D., affirmed Dr. Unversaw's opinion on September 14, 2011. (Tr. 565.)

On July 19, 2011, Hensley told Dr. Chang that her prior injections helped, but she still had a very tender area in her lumbar spine. (Tr. 579.) Dr. Chang performed a right lumbar paraspinous muscle trigger point injection. (*Id.*)

On July 28, 2011, Hensley complained to Dr. Fortson that her medications were not working; she was having a lot of pain in her back and hip. (Tr. 570.) Dr. Fortson diagnosed spondyloarthropathy and major depression, and prescribed Percocet and other medications. (*Id.*)

On August 11, 2011, Marc Levin, M.D., examined Hensley to determine if she was a candidate for a spinal cord stimulator. (Tr. 577.) Hensley described chronic low back pain radiating into the right leg, and had begun using a cane. (*Id.*) An examination revealed an antalgic gait, an inability to elevate herself on her heels or toes, blunted deep tendon reflexes in the lower extremities, and patchy motor strength. (Tr. 578.) Dr. Levin

reviewed the 2011 MRI of her spine and found "some mild changes without any significant foraminal or central stenosis and no loss of disc height." (*Id.*)  Dr. Levin diagnosed fibromyalgia and chronic pain, and opined that her pain was not being generated from her spine. (*Id.*)

On August 12, 2011, Hensley complained to Dr. Fortson of shoulder pain, restless extremities, and pain that was a "15" out of ten, for which Dr. Fortson prescribed medication. (Tr. 569.) On September 27, 2011, Hensley reported to Dr. Fortson that she had been involved in a motor vehicle accident. (Tr. 716.)  Dr. Fortson diagnosed fibromyalgia, excessive use of sedating medications, and motor vehicle accident trauma, and prescribed several medications. (*Id.*)

On October 7, 2011, Hensley was admitted to Methodist Hospital after a drug overdose. (Tr. 772.)  She denied trying to kill herself; she stated she took one extra sleeping pill and her boyfriend could not awaken her. (*Id.*)  Her diagnoses were major depression, drug overdose, and suicide attempt. (*Id.*)

On October 16, 2012, Hensley underwent a hysterectomy. (Tr. 1027.)  Her physical examination for this surgery found a normal spine, no CVA tenderness, and extremities within normal limits. (Tr. 1029–30.)

On October 24, 2011, Dr. Castelino's MSE of Hensley revealed anxiety and mood and sleep disturbances. (Tr. 616.) Her medications were refilled. (*Id.*)

On November 1, 2011, Hensley reported to Dr. Chang that the most recent trigger point injection gave her only a few weeks of relief. (Tr. 651.) An examination revealed "a lot" of myofascial trigger points in the lumbar region and bursitis in the hips. (*Id.*) On November 29, 2011, Hensley informed Dr. Chang that her pain had returned to the level she had six months before, and was radiating down to her ankle with foot numbness. (Tr. 649.) An examination revealed some mild antalgic gait, sacroiliac joint tenderness, and diffuse paraspinous muscle tenderness in the lumbar and thoracic area. (Id.) Dr. Chang prescribed medication and recommended additional injections. (*Id.*) In December 2011 and January 2012, Hensley received additional epidural steroid injections. (Tr. 644-45, 647-648.) In February 2012, Hensley told Dr. Chang she was about 50% improved after the latest injection. (Tr. 642.)

On January 13, 2012, Hensley complained to Dr. Fortson of not feeling well, and that she had not had access to her medications. (Tr. 741.) Dr. Fortson observed that she was having mild withdrawal symptoms, and noted that Hensley "has not been truthful with me in the past concerning her meds." (*Id.*) Dr. Fortson found that Hensley had no focal deficits and a normal gait, and diagnosed

lumbago, major depressive disorder, and opioid type dependence. (*Id.*) On January 19, 2012, Hensley told Dr. Fortson that the pain in her hip and back was an eight on a ten-point scale. (Tr. 742.) On February 16, 2012, Dr. Fortson completed a functional capacity form, checking boxes indicating that Hensley had "significant" limitations with standing, walking, lifting, pushing, pulling, bending, squatting, reaching above her shoulders, and performing other activities. (Tr. 719.)

On March 7, 2012, an MRI of Hensley's lumbar spine revealed small broad based posterior herniation of L5-S1 disc, with annular fissure causing mild narrowing of the central canal and neural foramina bilaterally, diffuse bulge of the L3-4 and L4-5 discs, causing mild narrowing of the central canal and neural foramina bilaterally, mild facet arthropathy at L4-5 and L5-S1, and minimal retrolisthesis of L3 vertebra over L4 and L4 over L5. (Tr. 672-73.)

On May 17, 2012, Hensley met with Candice Hunter, M.D., complaining of hallucinations and disturbed sleep, despite trying various medications for insomnia. (Tr. 1074.) An MSE revealed an anxious affect, difficulties expressing her thoughts, fair judgment, fair insight, and a GAF score of 50. (Tr. 1076.) Dr. Hunter diagnosed bipolar disorder and polysubstance dependence, and prescribed medications. (Tr. 1076-77.)

On May 22, 2012, Hensley complained to Dr. Chang of severe back pain radiating to the right lower extremity, which had worsened over the previous month. (Tr. 1053.) An examination revealed a slight antalgic gait and a 50% range of motion of the lumbar spine, 100% range of motion of lower extremities, and a lack of documented focal, neurological, or motor deficits. (Tr. 1053-55.) Dr. Chang diagnosed low back pain with radiculopathy in the right lower extremity; multiple lumbar disc protrusions, severe stenosis, degeneration, and spondylosis; chronic pain syndrome; myofascial pain syndrome; and a history of depression and anxiety. (*Id.*) Dr. Chang recommended another epidural steroid injection and continued medications. (Tr. 1054.)

On July 11, 2012, Hensley told Dr. Hunter that she had not slept for several days and she was having auditory hallucinations of music playing. (Tr. 1073.) An MSE revealed a tired mood, blunted affect, difficulty expressing thoughts, fair insight, and intact judgment. (Tr. 1072.) Dr. Hunter prescribed medications. (*Id.*) On August 10, 2012, Hensley told Dr. Hunter that she thought she was sleep walking, so Dr. Hunter substituted one of her prescription medications. (Tr. 1070-71.) Her mood was better, but she had a blunted affect. (*Id.*)

On August 12, 2012, Dr. Fortson completed a Multiple Impairment Questionnaire supplied by Hensley's counsel. (Tr. 681-88.) He diagnosed lumbosacral spondylosis, major depression,

15

opioid dependence, and juvenile rheumatoid arthritis. (Tr. 681.) Hensley's primary symptoms were back pain with radiculopathy, depression, and drug-seeking behavior with multiple accidental drug overdoses. (Tr. 682.) She had constant severe radicular pain in the back, legs, right hip, and both knees. (Tr. 682-83.) Hensley's pain was moderately severe, and her fatigue was severe. (Tr. 683.) Dr. Fortson opined Hensley was able to sit for four hours, and stand or walk for one hour, in an eight-hour workday. (*Id.*) When sitting, she needed to move around once or twice per hour for fifteen to twenty minutes. (Tr. 683-84.) He opined that Hensley could occasionally lift ten pounds and carry five pounds, had significant limitations performing repetitive reaching, handling, fingering, and lifting, and had moderate limitations using arms for reaching. (Tr. 684-85.) Dr. Fortson opined that Hensley is "severely disabled" (Tr. 687), and that her pain, fatigue, or other symptoms were constantly severe enough to interfere with her attention and concentration. (Tr. 686.) He noted that Hensley is bipolar and exhibits dependency and self-destructive behavior. (*Id.*) Dr. Fortson found Hensley is not a malingerer, and was incapable of tolerating "even 'low stress'" work. (*Id.*) He estimated Hensley would be absent from work, on the average, more than three times a month as a result of her impairments or treatment. (Tr. 687.)

On September 14, 2012, Dr. Hunter completed a Psychiatric/Psychological Impairment Questionnaire regarding Hensley. (Tr. 796-803.) She diagnosed Hensley with bipolar disorder. (Tr. 796.) The clinical findings supporting this diagnosis included sleep disturbance, mood disturbance, delusions or hallucinations, difficulty thinking or concentrating, and suicidal ideation or attempts. (Tr. 797.) Dr. Hunter opined that Hensley was "moderately" limited in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted; make simple work related decisions; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and, accept instructions and respond appropriately to criticism from supervisors. (Tr. 798-800.) Dr. Hunter opined that Hensley was "mildly" limited in understanding and memory, adaption, and sustained concentration and persistence. (Tr. 799-800.) According to Dr. Hunter, Hensley was incapable of tolerating "even 'low stress'" work. (Tr. 802.) Dr. Hunter estimated that Hensley would be absent from work, on the average, more than three times a month as a result of her impairments or treatment. (Tr. 803.)

On November 2, 2012, Hensley reported to Dr. Hunter increased depression since her hysterectomy and hypersomnia. (Tr. 1066.) An MSE revealed a down mood, a blunted affect, slow speech, intact judgment and fair insight. (Tr. 1067.) Dr. Hunter increased her Cymbalta and continued with other medications. (*Id.*) On December 14, 2012, Dr. Hunter observed Hensley was somewhat tremulous. (Tr. 1063.) An MSE revealed an anxious mood and affect, slow speech, intact judgment and fair insight. (Tr. 1064.) Dr. Hunter prescribed Xanax and Ritalin, and continued her other medications. (Tr. 1065.)

Hearing Testimony

At the hearing, Hensley testified that she stopped working because she was having back pain and mental issues. (Tr. 47.) She had difficulty waiting on customers because of her social anxiety. (*Id.*) She described her back, hip and knee pain as constant. (Tr. 52-53.) Hensley testified that she could not work because "can't even hardly move," requires "medication just to be able to get out of bed," and rarely leaves her house due to panic attacks. (Tr. 48.) She explained that injections dulled her pain for a couple of months, physical therapy did not work, and she "cannot find a doctor that will do surgery." (Tr. 49.) She takes several medications for pain, depression and anxiety, and medications just dull the pain. (Tr. 50-51, 53.) She testified that she uses a cane to walk due to her hip and knee pain. (Tr.

50, 60.) Hensley estimated she can sit for fifteen minutes at a time, stand for fifteen minutes, walk about half-a-block, and lift a gallon of milk. (Tr. 53-54.) She had not driven in six months due to hip pain. (Tr. 44.)

Hensley testified that sometimes she does not sleep, and has difficulties with her memory. (Tr. 54.) She described auditory and visual hallucinations, but her medication helps. (Tr. 55.) She maintained that, at the time of the hearing, she was not using any drugs not prescribed by a doctor. (Tr. 51.) Her symptoms did not improve when she was not using substances. (Tr. 52.) Hensley testified that she had abused poly-substances in attempt to commit suicide multiple times in the past. (Tr. 62.)

Hensley noted that she recently broke up with her boyfriend, but he still lives with her and helps her. (Tr. 58.) Her ex-boyfriend cleans the house, and lifts the groceries when they go shopping. (Tr. 57.) In a typical day, she spends a lot of time in bed watching TV or using a laptop to play games and Facebook. (Tr. 56-57.) She takes care of her own personal needs, such as dressing and eating. (Tr. 57.)

The ALJ asked the vocational expert ("VE") to assume an individual of Hensley's age, education, and work history who was limited to light work except she could only occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolding, occasionally balance, stoop, kneel, crouch, and crawl, and limited

to simple, routine, repetitive tasks and simple work-related decisions, frequent contact with supervisors and co-workers, no more than occasional interaction with the public on a superficial basis where public contact was not an integral part of the job, and the use of a cane in the right hand. (Tr. 65.) The VE testified that such an individual could not perform any of Hensley's past relevant work. (*Id.*) Such an individual could work as a production assembler, a small parts assembler, and an electronics worker. (Tr. 66.) According to the VE, if the individual were also limited to a low stress job that was not done at a production-rate pace such as assembly line work, but was more goal-oriented work, she could work as a cleaner or housecleaner, a cafeteria room attendant, and a dishwasher.[3] (Tr. 66-67.) An individual who was also required to stand for five minutes after every fifteen minutes of sitting would be unable to work at the light or sedentary level. (Tr. 67-68.) The VE testified that an individual who misses work three times a month could not do any of the jobs discussed. (Tr. 69.)

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g).

---

[3] The VE later noted that if the hypothetical individual was limited by the use of a cane, the housecleaner position would be eliminated. (Tr. 68.)

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (citation omitted); *see Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (noting "[t]his deferential standard of review is weighted in favor of upholding the ALJ's decision"). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or reweighing the evidence. *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). While a decision denying benefits need not address every piece of evidence, the ALJ must provide "an accurate and logical bridge" between the evidence and his conclusion that the claimant is not disabled. *Schreiber v. Colvin,* 519 Fed. App'x 951, 957-58 (7th Cir. 2013).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that she is disabled. 42 U.S.C. § 423(d)(1)(A) and 1382(a)(1). To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five-step evaluation:

Step 1: Is the claimant performing substantially gainful activity? If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4: Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy? If yes, the claim is denied; if no, the claimant is disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and 416.920 (a)(4)(i)–(v); *see also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994).

In this case, the ALJ found that Hensley had not engaged in substantial gainful activity since January 29, 2010, her alleged onset date. (Tr. 15.) The ALJ found that Hensley suffered from

the following severe impairments: degenerative disc disease; degenerative joint disease; obesity; depressive disorder; schizoaffective disorder; bipolar disorder; anxiety disorder; and a history of poly-substance abuse (20 C.F.R. § 404.1520(c) and 416.920(c)). (*Id.*) The ALJ further found that Hensley did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 16.)

The ALJ made the following Residual Functional Capacity ("RFC") determination:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; the claimant is able to occasionally balance, stoop, kneel, crouch, and crawl. The claimant is limited to simple routine repetitive tasks, simple work related decisions (identified as SVP 1 and 2 type jobs), and low stress jobs (work that is not done at production pace but more goal oriented). The claimant is able to have frequent contact with supervisors and coworkers and no more than occasional interaction with the public on a superficial basis. The claimant must be allowed the use of a cane when ambulating.

(Tr. 18.) Based upon Hensley's RFC, the ALJ found that Hensley is unable to perform her past relevant work as a photo shop manager and deli worker. (Tr. 26-27.) However, the ALJ found that Hensley was capable of performing other work that exists in significant

numbers in the national economy, including cafeteria room attendant, cleaner, and dishwasher. (Tr. 28.)

Hensley believes that the ALJ committed two errors requiring reversal. First, Hensley asserts that the ALJ failed to follow the treating physician's rule by giving little weight to Hensley's treating physicians. Second, Hensley argues that the ALJ failed to properly evaluate her credibility.

## ALJ's Evaluation of Treating Physicians' Opinion Evidence

Plaintiff argues that the ALJ failed to consider the factors set forth in 20 C.F.R. section 404.1527(c) when weighing the opinions of the treating physicians in this case. Pursuant to Section 404.1527(c)(1), the opinions of treating physicians are entitled to greater weight than those of examining and non-examining physicians. While an ALJ generally affords "more weight to the opinion of a source who has examined a claimant than to the opinion of a source who has not, the weight ultimately given to that opinion depends on its consistency with and objective medical support in the record; the quality of the explanation the source gave for the opinion; and the source's specialization." *Givens v. Colvin,* 551 Fed. App'x 855, 860 (7th Cir. 2013) (internal quotation omitted). An ALJ may discount a treating physician's opinion if it is inconsistent with the medical record. *See* 20 C.F.R. § 404.1527(c)(2), (4).

<u>Treating Physician Dr. Fortson</u>

The ALJ gave "little weight" to Dr. Fortson's opinion that Hensley has significant exertional and functional limitations and that she is "totally" and "severely disabled." (Tr. 26.) An ALJ may "discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for revising or reflecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Here, the ALJ discounted Dr. Fortson's opinions because they were inconsistent with his treatment notes from January 2012, Dr. Chang's findings from May 2012, and a clinical examination in October 2012. (Tr. 26.) Dr. Fortson's January 2012 examination found that Hensley had no focal deficits and a normal gait. (Tr. 26, 741.) Dr. Chang's May 2012 examination found a lack of documented focal, neurological, or motor deficits. (Tr. 26, 1053-55.) Hensley's October 2012 examination found that Hensley had a normal spine, no CVA tenderness, and extremities within normal limits. (Tr. 26, 1028-30.

Hensley argues that the ALJ erred by relying on only these three clinical examinations. An ALJ should not use a "'sound-bite' approach to record evaluation," choosing only the findings that support his conclusion, and ignoring other evidence consistent with the treating doctor's reports. *Scrogham v. Colvin*,

765 F.3d 685, 698 (7th Cir. 2014) (citation omitted). Hensley maintains that Dr. Fortson's opinions regarding her physical limitations were supported by clinical and diagnostic findings, and that the ALJ failed to identify any other substantial evidence contradicting his opinions. *See* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) (giving controlling weight to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record").

The decision reflects that the ALJ considered Dr. Fortson's records. *(See, e.g.,* Tr. 20 (citing Dr. Fortson's treatment notes at Ex. 33F/9), 21 (citing Dr. Fortson's treatment notes at Ex. 38F/140), 26 (citing Dr. Fortson's opinions and treatment notes).) He also considered other diagnostic and clinical findings, including: diagnostic testing and the 2012 MRI showing only mild or minimal abnormalities in her lumbar spine (Tr. 21 (citing Tr. 690, 909, 1060)), diagnostic testing showing minimal degenerative changes to her knee (*id.* (citing Tr. 813)); clinical examinations showing tenderness, decreased range of motion of the spine, and crepitus of the knees (Tr. 21 (citing Tr. 278-81)); an August 2011 visit with a spinal specialist noting abnormalities to her deep tendon reflexes and motor, but a subsequent September 2011 examination finding no focal deficits (*id.* (citing Tr. 577-78, 943)); examinations showing normal straight leg raise testing,

normal sensory, lack of joint abnormalities, no sacroiliac joint tenderness, fair range of spinal motion, and no focal deficits (*id.* (citing Tr. 280, 508)); January 2012 notes indicating no focal deficits and normal gait (*id.*); March 2012 notes indicating she was neurologically normal as to strength and coordination (*id.* (citing Tr. 734)); and May 2012 notes showing no abnormalities in her extremities, intact sensations in her lower extremities, only a "slight" antalgic gait, the ability to walk on heels and toes, good motor strength, and full range of motion in her lower extremities (*id.* (citing Tr. 1053)).

Hensley also argues that the ALJ failed to consider the factors provided in 20 C.F.R. sections 404.1527 and 416.927 in weighing Dr. Fortson's opinion. *See* SSR 96-2p (treating source medical opinions "must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927"). If a treating opinion is not entitled to controlling weight, the ALJ must determine what weight to assign it by considering "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citations omitted); *see* 20 C.F.R. § 404.1527(c)(2). Depending on how these factors apply, an opinion from a non-examining source may be entitled to more weight than an opinion from a treating source. *See, e.g., Polchow v. Astrue*, No.

10 CV 6525, 2011 WL 1900065, at *13 (N.D. Ill. May 19, 2011) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 376–77 (7th Cir. 2006)) (finding the decision to afford greater weight to non-examining physicians' opinions than those of the treating psychologist was supported by substantial evidence)). While the Seventh Circuit has criticized decisions that "said nothing regarding this required checklist of factors," *Larson*, 615 F.3d at 751, it has "made clear that an ALJ need not explicitly weigh every relevant factor to conclude that a treating physician's opinion should be discounted, as long as the ALJ otherwise articulates why it is inconsistent with the record." *Greathouse v. Colvin*, No. 1:14–CV–00805–JMS–DKL, 2015 WL 506276, at *7 (S.D. Ind. Feb. 6, 2015) (citing *Schreiber*, 519 Fed. App'x at 959).

Here, while the ALJ did not explicitly weigh each factor in discussing Dr. Fortson's opinion, his decision makes clear that he considered many of the factors, including Dr. Fortson's treatment relationship with Hensley, the consistency of his opinion with the record as a whole, and the supportability of his opinion.[4] *See*

---

[4] Hensley insists that Dr. Fortson's opinions are "consistent with examining neurosurgeon, Dr. Levin, who opined that Ms. Hensley's description of her pain was 'truly being generated from the spine,' based on the MRI findings (Tr. 578)." (DE# 11 at 25.) A review of the record reveals that this was not Dr. Levin's opinion; indeed, it was the opposite: "It is *not* our impression at this time that the pain that she is describing in her back and leg is truly being generated from her spine, especially with the appearance of her MRI." (Tr. 578 (emphasis added).) Moreover, the ALJ relied on Dr. Levin's opinion in issuing this decision,

*Schreiber*, 519 Fed. App'x at 959.  The Court finds that the ALJ built an "accurate and logical bridge" between the evidence and his conclusion, *id*., and sufficiently articulated reasons for affording little weight to Dr. Fortson's opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citation omitted) (noting the "very deferential standard" that the Seventh Circuit has deemed "lax," under which an ALJ need only "minimally articulate" reasons for considering evidence).

## Non-Examining Medical Consultants

Hensley argues that the ALJ erred by affording "great weight" to the opinions of non-examining state agency medical consultants Dr. J. Sands and Dr. Eskonen.  (DE# 11 at 22-23.)  She insists that the opinions of these non-treating, non-examining sources who reviewed an "unknown portion of the complete medical file" should not supplant Dr. Fortson's opinions.  (DE# 11 at 24.)  Courts expect "a sound explanation for the weight assigned to the medical opinions" where a "treating physician's opinion was given only some weight while the opinion of a non-examining State agency physician, who did not review the entire record, was given great weight." *Pennington v. Colvin*, No. 3:14-CV-1628, 2015 WL 4093345, at *5 (N.D. Ind. July 7, 2015); *see Beardsley v. Colvin*, 758 F.3d

---

noting that "upon seeking treatment from specialists, it was reported that the claimant is not a candidate for surgical intervention or the insertion of a spinal stimulator." (Tr. 21 (citing Dr. Levin's opinion).)

834, 839 (7th Cir. 2014) (courts "await a good explanation" when an ALJ rejects an examining source's opinion in favor of a non-examining source's opinion). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The ALJ gave great weight to Dr. Sands' and Dr. Eskonenon's opinions that Hensley is capable of less than the full range of light exertional activity, with similar postural limitations found in the RFC. (Tr. 25.) But the ALJ did not rely on these opinions alone. Rather, he found that these opinions were supported by "the lack of significant focal, motor or neurological deficits, as well as the conservative nature of treatment." (Tr. 25; *see* Tr. 21-22 (describing this evidence in detail).) The ALJ considered these opinions in his analysis of the entire record, including treatment notes showing few abnormalities, conservative treatment, inconsistencies, non-compliance and mild test results. (Tr. 19-25.) The Court finds that this evidence supports the ALJ's conclusion that Hensley's severe impairments do not cause an inability to work at a light level with additional work limitations. *See Schofield v. Colvin*, No. 1:14-CV-1197, 2015 WL 4724920, at *9 (S.D. Ind. Aug. 10, 2015).

<u>Treating Physicians Dr. Castelino and Dr. Hunter</u>

Hensley argues that the ALJ erred by giving "little weight" to the opinions of treating physicians Dr. Castelino and Dr. Hunter. (*See* Tr. 25-26.) In April 2011, Dr. Castelino diagnosed Hensley with schizoaffective disorder and opined that she had "moderate" to "marked" limitations with concentration, persistence, social interactions, and adaptation, and was unable to tolerate "even low stress" work. (Tr. 25, 244-51.) In September 2012, Dr. Hunter diagnosed Hensley with bipolar disorder, and opined that she had "mild" to "moderate" limitations with understanding, memory, concentration, persistence, and social interactions, and was unable to tolerate "even low stress" work. (Tr. 25, 796-803.)

The ALJ afforded little weight to Dr. Castelino's opinions because they were inconsistent with Hensley's MSEs and her capacity to maintain a relationship with a significant other. (Tr. 25.) Hensley insists that Dr. Castelino provided appropriate medical support for his opinions, and thus, his opinions were entitled to controlling weight. Hensley points to the clinical findings in Dr. Castelino's opinion indicating that she had poor memory, perceptual disturbance, mood and sleep disturbances, emotional lability, blunt, flat or inappropriate affect, social withdrawal or isolation, delusions or hallucinations, decreased energy, manic syndrome, recurrent panic attacks, anhedonia or pervasive loss of

interests, psychomotor retardation, paranoia, generalized persistent anxiety, feelings of guilt or worthlessness, difficulty thinking or concentrating, and suicidal ideation or attempts. (Tr. 245.)

In her brief, Hensley cites several MSEs to support Dr. Castelino's clinical findings. While these MSEs indicate disturbed mood and sleep, anxiety, and anger, they do not support Dr. Castelino's other findings. (*See* DE# 11 at 26 (citing Tr. 380 (noting issues with mood, sleep, anger, and anxiety), 382 (same), 610 (noting issues with mood and sleep), 614 (noting issues with mood, sleep, and anxiety)).) The ALJ considered a series of Hensley's MSEs and found them without significant psychiatric symptomology, despite some abnormality as to mood, sleep and anxiety. (Tr. 23-24.) As the ALJ noted, the MSEs documented Hensley as within normal limits as to orientation, appearance, affect, memory, concentration, and cognition, and failed to identify significant memory, concentration or cognition difficulties. (Tr. 24 (citing Hensley's nearly monthly MSEs from late 2010 through 2012).)

Hensley asserts that the ALJ erred by discounting Dr. Castelino's opinion of "marked social limitations" based on her relationship with her boyfriend. (Tr. 25.) While Hensley asserts that her relationship with her boyfriend did not work out, at the time of the hearing, he was still living with and helping her.

(Tr. 44.) Courts have found evidence of such relationships to be persuasive. *See Williams v. Colvin*, No. 12-cv-802, 2013 WL 4501049, at *12 (W.D. Wis. Aug. 22, 2013) (affirming ALJ's finding of no marked difficulties with social functioning where claimant had a girlfriend); *Sutherland v. Astrue*, No. 2:11-cv-24, 2012 WL 911898, at *10 (N.D. Ind. Mar. 15, 2012) (affirming ALJ's rejection of doctor's opinion of "marked limitation" based in part on claimant's relationship with her boyfriend and daughter). The Court finds that the ALJ did not err in considering evidence regarding Hensley's relationship with her ex-boyfriend, and notes that the ALJ afforded her some limitation regarding her ability to socially interact by including "no more than occasional interaction with the public on a superficial basis" in the RFC. (Tr. 18.)

Hensley argues that the ALJ also erred by giving little weight to Dr. Hunter's opinions. (Tr. 25.) Dr. Hunter opined that Hensley was "incapable of even low stress" work and that she would miss work more than three times a month due to her impairments. (Tr. 802-03.) The ALJ found these opinions to be inconsistent with Dr. Hunter's clinical findings that Hensley had no more than moderate limitations in any area of mental functioning. (Tr. 25, 799-801.) Hensley maintains that there is "no reason why moderate limitations . . . in multiple areas of daily mental functioning cannot preclude an individual from handling even low stress work

or resulting multiple absences from work each month." (DE# 11 at 27.) But Dr. Hunter found only mild limitations with several functions relating to the workplace, such as abilities to carry out simple instructions, perform activities within a schedule, "maintain regular attendance," sustain an ordinary routine without supervision, "get along with co-workers or peers," and respond appropriately to changes in the work setting. (Tr. 799-801.) These findings adequately support the ALJ's conclusion that there is "little correlation between [Hensley's] mild to moderate limitations and her inability as to even low stress work and multiple absences from work." (Tr. 25.)

The ALJ also found Dr. Hunter's opinions to be inconsistent with Dr. Chang's May 2012 assessment that Hensley was oriented, with a normal mood and affect, without signs of anxiety or agitation, and displayed a good and normal memory. (Tr. 25, 1053-43.) The ALJ concluded that Dr. Chang's assessment was consistent with the totality of Hensley's individualized treatment, which was without significant psychiatric symptomology. (Tr. 25-26; see Tr. 24.) Furthermore, the ALJ found that Dr. Hunter's opinions were inconsistent with her December 2012 treatment notes that Hensley was "alert, oriented, cooperative, without psychomotor agitation, coherent in thought process and without delusion or hallucination, displaying normal cognition, intact memory, average intelligence, intact judgment, fair insight, and intact concentration and

attention." (Tr. 26 (citing Tr. 1064).) Hensley claims that treatment records confirm Dr. Hunter's clinical findings of sleep and mood disturbance, delusions or hallucinations, difficulty thinking or concentrating, and suicidal ideation or attempts. (DE# 11 at 27.) The records cited by Hensley support findings of sleep and mood disturbance, and some difficulty expressing thoughts, but do not support other findings. (*See id*. (citing Tr. 1063-64 (MSE finding Hensley without delusions or hallucinations, alert, with normal cognition, and not suicidal), 1066-67 (same), 1068-69 (same), 1070-71 (same); 1072-73 (without delusions, normal cognition, not suicidal); 1074-77 (same).)

Finally, Hensley argues that the ALJ failed to address the factors of Section 404.1527 in considering the opinions of Dr. Castelino and Dr. Hunter. As discussed above, an ALJ is not required to "explicitly weigh every relevant factor to conclude that a treating physician's opinion should be discounted," as long as he articulates why that opinion is inconsistent with the record. *Greathouse*, 2015 WL 506276, at *7. Here, the ALJ noted that both doctors were treating physicians and explained why their opinions were neither supported by nor consistent with the rest of the record. (Tr. 25-26.) This is sufficient. *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (finding it "is enough" for an ALJ to note a lack of medical evidence supporting an opinion

and its inconsistency with the rest of the record, where the ALJ did not explicitly weigh every factor).

ALJ's Credibility Determination

Hensley claims that the ALJ erred in finding that her statements regarding the intensity, persistence and limiting effects of her symptoms were not fully credible to the extent they are inconsistent with the RFC assessment. (Tr. 19.) Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, the ALJ must articulate specific reasons for discounting a claimant's testimony as being less than credible, and cannot merely ignore the testimony or rely solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility determination. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005); SSR 96-7p (requiring ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."). The ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements

and the reasons for that weight. *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

Here, the ALJ provided sufficient support for his credibility finding. He considered Hensley's daily activities, which included doing laundry, preparing simple meals, and spending time with her ex-boyfriend. (Tr. 17, 19.) The ALJ also noted "inconsistencies in the record as to reports made by [Hensley], which indicates that the information obtained from [her] may not be entirely reliable." (Tr. 19.) For example, the ALJ addressed records showing that Hensley had reported paranoia and audio hallucinations while hospitalized, but upon learning that she would be taken to court for possible State commitment, she suddenly improved and reported that she felt well, and was without audio or visual hallucinations, paranoid thoughts, depression, suicidal thoughts, or manic symptomology. (Tr. 23, 285.) The ALJ also considered Dr. Fortson's notes that Hensley "has not been truthful with me in the past." (Tr. 20, 741.) Hensley does not contest these findings.

In assessing Hensley's credibility, the ALJ also found that: (1) "objective diagnostic testing" did not support the intensity, persistence and limiting effects of Hensley's alleged symptomology (Tr. 19-20); (2) Hensley's physical and mental treatments were conservative in nature (Tr. 20); (3) Hensley made inconsistent statements about using aerosol cans to "get high" or commit suicide

(*id*.); and (4) she was non-compliant with her psychotropic medications between hospitalizations (Tr. 23). Hensley objects to each of these findings.

Hensley argues that the ALJ erred by concluding that the clinical and diagnostic evidence do not support her alleged limitations. In support of her position, Hensley refers in cursory fashion to the opinions of "three separate treating doctors," and "the fact that numerous treating and examining physicians found otherwise." (DE# 11 at 29.) Because Hensley failed to cite to the record for these assertions, the Court can only presume she intends to refer to the opinions of Drs. Fortson, Castelino and Hunter. Because the Court has found that the ALJ did not err in assigning little weight to these opinions, the Court finds this argument to be unpersuasive.

Hensley also asserts that a credibility determination cannot be made solely on the basis of objective medical evidence. *See* SSR 96-7p. However, an ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility, and "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical

evidence in the record."). While the ALJ articulated reasons for considering clinical and diagnostic evidence, he did not rely solely on this evidence in assessing Hensley's credibility. (Tr. 20-21.) He considered several other factors, including Hensley's medical treatment, medications taken, daily activities, work history, opinions, allegations of pain, and inconsistencies in her statements and complaints. (Tr. 19-26.)

Hensley asserts that the ALJ erred by characterizing her physical and mental treatment as "conservative." (Tr. 20.) She insists that her treatment of spinal injections and narcotic pain medications should have been considered more than conservative. *But see Olsen v. Colvin,* 551 Fed. App'x 868, 875 (7th Cir. 2014) (characterizing epidural steroid injections as "conservative treatment" was supported by substantial evidence) (citation omitted). The ALJ addressed Hensley's injections and medications, stating that "there is specific evidence that [Hensley's] physicians do not consider her to be a candidate for more aggressive treatment (such [as an] insertion of a spinal stimulator or the undertaking of surgical intervention)." (Tr. 20; *see* Tr. 21.) The ALJ also noted Dr. Kondamuri's opinion that Hensley's spinal disease "was 'not that severe' and that the use of addictive opioid-based medications was not supported." (Tr. 21.) Regarding Hensley's mental treatment, the ALJ relied upon records indicating "more or less normal" MSEs and a lack of significant psychiatric

symptomology. (Tr. 22.) Hensley's MSEs were consistently "without significant abnormality" upon discharge from hospitalization, though the ALJ acknowledged that records from Hensley's most recent hospitalization indicate that she had some memory and cognitive deficits with decrease insight and judgment. (Tr. 22-23.) The ALJ considered these abnormalities, and thus limited her concentration, persistence and pace. (Tr. 23.) Hensley's MSEs from her individualized treatment fail to indicate significant memory, concentration or cognition difficulties. (Tr. 24.) Given the deference that courts show to an ALJ's factual determination, the Court will not question the ALJ's finding that Hensley's physical and mental treatments were conservative. *Simila v. Astrue,* 573 F.3d 503, 519 (7th Cir. 2009).

Finally, Hensley takes issue with the ALJ's findings that Hensley made inconsistent statements about using aerosol cans to attempt suicide or to "get high," and that she was sometimes non-compliant with taking medication. (Tr. 23-24.) She maintains that there is no evidence that she engaged in ongoing substance abuse or that non-compliance contributed to her disability, and argues that the ALJ failed consider evidence that her severe mental impairments resulted in "impaired insight and judgment."[5] (DE# 11

---

[5] The Court notes that while Hensley asserts that her insight and judgment were impaired, the records she cites mostly indicate that her judgement was "intact" and her insight was "fair." (DE# 11 at 30 (citing Tr. 1064 ("Judgement: Intact" and "Insight: Fair"),

at 30); *see, e.g., Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (noting ALJs should consider alternative explanations for non-compliance with treatment when dealing with claimants suffering from severe mental conditions before concluding that non-compliance supports an adverse credibility inference). While the ALJ cited Hensley's non-compliance with treatment, it was but one of many factors considered in assessing her credibility. *See Griggs v. Astrue,* No. 1:12-CV-00056, 2013 WL 1976078, at *8 (N.D. Ind. May 13, 2013) (affirming ALJ's decision where "sporadic compliance with treatment was just one of several factors that the ALJ considered when assessing her credibility"). Even if the ALJ misconstrued the evidence of Hensley's non-compliance, the other evidence on which he relied was sufficient to support the conclusion that Hensley's complaints were not entirely credible.

The ALJ's credibility determination was supported by evidence in the record and this Court cannot say that the credibility determination was "patently wrong." *See Skarbek*, 390 F.3d at 504; *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("an ALJ's credibility assessment will stand as long as there is some support in the record") (quotation and brackets omitted). Therefore, the

---

1067 (same), 1069 (same), 1072 (same), 1076 (same), and 295 (Hensley had "poor insight and judgment [upon hospitalization]. . . . She began to have better insight and judgment."); *see* Tr. 296 ("Insight and judgment improved.").)

ALJ's credibility determination, which is entitled to special deference, is affirmed.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **AFFIRMED**.

**DATED: September 9, 2015**        **/s/ RUDY LOZANO, Judge**
                                    **United States District Court**